JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Teamsters Local 837 401(k) Plan

**(b)** County of Residence of First Listed Plaintiff   Philadelphia
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Thomas Kohn, Esq., Markowitz and Richman, 123 S. Broad Street, Suite 2020, Philadelphia, PA 19109 (215)

## DEFENDANTS

Aluminum Shapes, LLC

County of Residence of First Listed Defendant   Camden, N.J.
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                    *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**  **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane  ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product        Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument |        Liability  ☐ 367 Health Care/ | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &        Pharmaceutical | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
|        & Enforcement of Judgment |        Slander        Personal Injury | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'        Product Liability | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted |        Liability  ☐ 368 Asbestos Personal | |        New Drug Application | ☐ 470 Racketeer Influenced and |
|        Student Loans | ☐ 340 Marine        Injury Product | | ☐ 840 Trademark |        Corrupt Organizations |
|        (Excludes Veterans) | ☐ 345 Marine Product        Liability | | ☐ 880 Defend Trade Secrets | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment |        Liability  **PERSONAL PROPERTY** | **LABOR** |        Act of 2016 |        (15 USC 1681 or 1692) |
|        of Veteran's Benefits | ☐ 350 Motor Vehicle  ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | | ☐ 485 Telephone Consumer |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle  ☐ 371 Truth in Lending |        Act | **SOCIAL SECURITY** |        Protection Act |
| ☐ 190 Other Contract |        Product Liability  ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal        Property Damage |        Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| ☐ 196 Franchise |        Injury  ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) |        Exchange |
| | ☐ 362 Personal Injury -        Product Liability | ☐ 751 Family and Medical | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| |        Medical Malpractice | |        Leave Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS**  **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights  **Habeas Corpus:** | ☒ 791 Employee Retirement | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information |
| ☐ 220 Foreclosure | ☐ 441 Voting  ☐ 463 Alien Detainee |        Income Security Act | ☐ 870 Taxes (U.S. Plaintiff |        Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment  ☐ 510 Motions to Vacate | |        or Defendant) | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/        Sentence | | ☐ 871 IRS—Third Party | ☐ 899 Administrative Procedure |
| ☐ 245 Tort Product Liability |        Accommodations  ☐ 530 General | |        26 USC 7609 |        Act/Review or Appeal of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -  ☐ 535 Death Penalty | **IMMIGRATION** | |        Agency Decision |
| |        Employment        **Other:** | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of |
| | ☐ 446 Amer. w/Disabilities -  ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | |        State Statutes |
| |        Other  ☐ 550 Civil Rights |        Actions | | |
| | ☐ 448 Education  ☐ 555 Prison Condition | | | |
| | ☐ 560 Civil Detainee - | | | |
| |        Conditions of | | | |
| |        Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
29 U.S.C. Section 1132

Brief description of cause:
Failure to make benefit fund contributions

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER RULE 23, F.R.Cv.P.

**DEMAND $**
$125,879.11 +

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☐ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE   R. Barclay Surrick   DOCKET NUMBER  19-4739

DATE
1/25/21

SIGNATURE OF ATTORNEY OF RECORD
*Thomas H. Kohn*

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Eastern District of Pennsylvania 🔽

| | |
|---|---|
| TEAMSTERS LOCAL 837 401(k) PLAN | ) |
| | ) |
| | ) |
| | ) |
| *Plaintiff(s)* | ) |
| v. | ) |
| ALUMINUM SHAPES, LLC | ) |
| | ) |
| | ) |
| *Defendant(s)* | ) |

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   Aluminum Shapes, LLC
9000 River Road
Delair, NJ  08110

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Thomas H. Kohn, Esquire
Markowitz and Richman
123 S. Broad Street
Suite 2020
Philadelphia, PA  19109

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____                    _____

*Signature of Clerk or Deputy Clerk*

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____12275 Townsend Road, Phila., PA 19154_____

Address of Defendant: _____9000 River Road, Delair, NJ 08110_____

Place of Accident, Incident or Transaction: _____12275 Townsend Road, Phila., PA 19154_____

---

*RELATED CASE, IF ANY:*

Case Number: ___19-4739___     Judge: ___R. Barclay Surrick___     Date Terminated: ___10/22/2020___

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?     Yes ☑     No ☐

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?     Yes ☑     No ☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?     Yes ☐     No ☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?     Yes ☐     No ☑

I certify that, to my knowledge, the within case ☒ is / ☐ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: ___01/25/2021___     _[signature]_     ___35811___
                          *Attorney-at-Law / Pro Se Plaintiff*     *Attorney I.D. # (if applicable)*

---

**CIVIL:** (Place a √ in one category only)

**A.**     *Federal Question Cases:*

☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
☐ 2. FELA
☐ 3. Jones Act-Personal Injury
☐ 4. Antitrust
☐ 5. Patent
☑ 6. Labor-Management Relations
☐ 7. Civil Rights
☐ 8. Habeas Corpus
☐ 9. Securities Act(s) Cases
☐ 10. Social Security Review Cases
☐ 11. All other Federal Question Cases
       *(Please specify):* _____

**B.**     *Diversity Jurisdiction Cases:*

☐ 1. Insurance Contract and Other Contracts
☐ 2. Airplane Personal Injury
☐ 3. Assault, Defamation
☐ 4. Marine Personal Injury
☐ 5. Motor Vehicle Personal Injury
☐ 6. Other Personal Injury *(Please specify):* _____
☐ 7. Products Liability
☐ 8. Products Liability – Asbestos
☐ 9. All other Diversity Cases
       *(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, ___Thomas H. Kohn___, counsel of record *or* pro se plaintiff, do hereby certify:

☑ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☐ Relief other than monetary damages is sought.

DATE: ___01/25/2021___     _[signature]_     ___35811___
                          *Attorney-at-Law / Pro Se Plaintiff*     *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---------------------------------------------------------

TEAMSTERS LOCAL 837 401(k) Plan
                    Plaintiff

  v.                                                    Case No.

ALUMINUM SHAPES, LLC
                    Defendants

-------------------------------------------------------x

## CASE MANAGEMENT TRACK DESIGNATION FORM

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a)  Habeas Corpus -- Cases brought under 28 U.S.C. §2241
     through §2255.                                          ( )

(b)  Social Security -- Cases requesting review of a decision
     of the Secretary of Health and Human Services denying
     plaintiff Social Security Benefits                      ( )

(c)  Arbitration -- Cases required to be designated for
     arbitration under Local Civil Rule 53.2                 ( )

(d)  Asbestos -- Cases involving claims for personal injury
     or property damage from exposure to asbestos.           ( )

(e)  Special Management -- Cases that do not fall into tracks
     (a) through (d) that are commonly referred to as complex
     and that need special or intense management by the
     court. (See reverse side of this form for a detailed
     explanation of special management cases.)               ( )

(f)  Standard Management -- Cases that do not fall into
     any one of the other tracks.                            (x )


_____                    */s/ Thomas H. Kohn*
      1-25-21                                 _____
Date                                         THOMAS H. KOHN, ESQUIRE
                                             Attorney for Plaintiff

1

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TEAMSTERS LOCAL 837 401(K) PLAN :<br>12275 Townsend Road :<br>Philadelphia, PA 19154, :<br> :<br>        Plaintiff :<br> :<br>      v. :<br> :<br>ALUMINUM SHAPES, LLC :<br>9000 River Road :<br>Delair, NJ 08110, :<br> :<br>        Defendant :<br> : | Civil Action No. |

## COMPLAINT

The plaintiff, Teamsters Local 837 401(k) Plan, by and through its attorney, Thomas H. Kohn of Markowitz and Richman, complaining of the defendant, Aluminum Shapes, LLC, respectfully alleges:

## NATURE OF THE CLAIM

1.      This action is instituted pursuant to Sections 502 and 515 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1132 and 1145, to collect unpaid fringe benefit contributions.

## JURISDICTION AND VENUE

2,      Jurisdiction is conferred on this court by ERISA Sections 502(d), (e)(1) and (f), 29 U.S.C. §§ 1132(d), (e)(1) and (f), and by the provisions of 28 U.S.C. §§ 1331,1332 and 1337.

3.      Venue is proper in this court pursuant to Section 502 (e)(2) of ERISA, 29 U.S.C. § 1132(e)(2), in that the Plan is administered within this District.

## PARTIES

4.      The plaintiff, Teamsters Local 837 401(k) Plan ("Plan"), is an employee benefit

plan within the meaning of 29 U.S.C. § 1002(3).  Its office is located at 12275 Townsend Road,

Philadelphia, PA 19154.

5.      Defendant, Aluminum Shapes, LLC ("Aluminum Shapes"), is, and at all times

relevant hereto has been, an employer within the meaning of Section 152(2) of the LMRA, 29

U.S.C. § 152(2), and Section 2(5) of ERISA, 29 U.S.C. § 1002(5), with its principal place of

business located at 9000 River Road, Delair, New Jersey 08110.

6.      Upon information and belief, no party to this action has filed for protection under

the U.S. Bankruptcy Code during the time in which the action arose or thereafter.

## FACTUAL ALLEGATIONS

7.      At all times relevant to this action, Aluminum Shapes has been signatory to a

collective bargaining ("CBA" or "Agreement") with Teamsters Local Union 107 and, as such, is

bound by the terms of that Agreement.  [A copy of the Agreement is attached hereto as Exhibit

A].

8.      Aluminum Shapes' employees who are covered by the terms of the CBA are

participants in, and beneficiaries of, the Plan.

9.      The CBA requires Aluminum Shapes to make monthly contributions to the Plan

for each employee who has completed a probationary period and was actively at work during the

preceding month, except those who quit or were discharged.

10.     The Plan maintains a Policy for Collecting Delinquent Contributions ("Policy"),

to which Aluminum Shapes is also bound.  [A copy of the Plan's Policy for Collecting

Delinquent Contributions is attached hereto as Exhibit B].

11.     The Plan's Policy requires employers to: make required contributions on or before the 15th day of the following month for each month where contributions are due, unless some other date is provided for in a collective bargaining agreement; pay interest on delinquent contributions at the rate of 12% per annum; pay liquidated damages on delinquent contributions equal to 12% of the contributions due and owing; permit the Plan to audit the books and records of a participating employer; and pay attorney's fees and costs in the event the Plan initiates legal action for the purpose of collecting delinquent contributions.

12.     At all times relevant to this suit, Aluminum Shapes employed individuals whose wages, hours and terms and conditions of employment were governed by the Agreement.

13.     In accordance with the Agreement, Aluminum Shapes is required to make specific contributions to the Plan on behalf of each eligible employee.

14.     Notwithstanding that obligation, Aluminum Shapes has failed to make required contributions in an estimated amount of at least $114,595.10 for the months of November, 2019 through April, 2020.

15.     Subsequent to April 2020, Aluminum Shapes has failed to submit remittance reports to the Fund or to make any contributions to it. Consequently, the Fund is not able to ascertain what additional contributions are owed for hours worked by covered employees of Aluminum Shapes.

## ALUMINUM SHAPES' LIABILITY UNDER ERISA

16.     Paragraphs 1 through 15 of this Complaint are re-alleged as if fully set forth herein.

17.     Section 515 of ERISA, 29 U.S.C. § 1145, requires that every employer who is obligated to make contributions to a multi-employer plan under the terms of the plan or under the

terms of a collective bargaining agreement shall do so in accordance with such plan or agreement.

18.     Section 502(g) of ERISA, 29 U.S.C. § 1132(g)(2), provides that in any suit instituted for or on behalf of a multi-employer plan to enforce the payment of delinquent contributions, the Court shall, if judgment is entered in favor of the plan, award the plan:  (a) the unpaid contributions, plus (b) interest on the unpaid contributions, plus (c) an amount equal to the greater of (i) interest on the unpaid contributions or (ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under federal or state law) of the amount determined by the Court under subparagraph (a), plus (d) reasonable attorney's fees and costs of the suit, plus (e) such other legal or equitable relief as the court deems appropriate.  As of this date, the interest and liquidated damages owed t the Plan by defendant exceed $27,770.

19.     Aluminum Shapes' failure to make its required contributions to the Plan constitutes a violation of ERISA and applicable Department of Labor and Internal Revenue Service regulations.

**WHEREFORE,** plaintiff respectfully requests that this Honorable Court:

(a)     Enter an Order for judgment in favor of the plaintiff and against defendant, its officers, directors and agents, in an amount not less than $125,879.11, which includes delinquent contributions, liquidated damages and interest owed to the Plan for the period including November and December, 2019 and January through April, 2020.

(b)     Enter an Order for judgment in favor of the plaintiff and against defendant for interest on the unpaid contributions and liquidated damages;

(c)     Enter an Order directing Aluminum Shapes to provide access to its books and

records to the Plan's auditors for the purpose of determining if additional amounts

are owed to the Plan;

(d)     Enter an Order directing Aluminum Shapes to pay the Fund any further

contributions that may be found to be due and owing;

(e)     Enter an Order directing Aluminum Shapes to henceforth meet its reporting and

remission requirements, and otherwise to make future contributions in a timely

fashion and in accordance with the collective bargaining agreement, the Plan's

policies and ERISA;

(f)     Enter an Order directing Aluminum Shapes to pay to plaintiff all reasonable

attorney's fees, expenses and the costs of research, investigation, initiation,

maintenance and prosecution of this action;

(g)     Award plaintiff such other and further relief as may be just, necessary and proper.

Respectfully submitted,

MARKOWITZ & RICHMAN

/s/ Thomas H. Kohn

THOMAS H. KOHN, ESQUIRE
123 South Broad Street, Suite 2020
Philadelphia, PA 19109
Phone:  215-901-8097
Fax:  215-791-0668
tkohn@markowitzandrichman.com

EXHIBIT A



Aluminum Shapes, LLC



Teamsters Local 107

Agreement between

# ALUMINUM SHAPES, LLC

# &

# TEAMSTERS LOCAL 107

TERM:
January 9, 2016 to
December 31, 2019

**ARTICLE I**
RECOGNITION OF UNION

**ARTICLE II**
PROBATIONARY PERIOD.................................................................................................1

**ARTICLE III**
UNION SECURITY AND CHECK-OFF..............................................................................1

**ARTICLE IV**
HOURS OF WORK.............................................................................................................2

**ARTICLE V**
HOLIDAYS.........................................................................................................................5

**ARTICLE VI**
WAGES...............................................................................................................................7

**ARTICLE VII**
REPORT-IN PAY................................................................................................................9

**ARTICLE VIII**
VACATION AND PERSONAL TIME................................................................................9

**ARTICLE IX**
HEALTH AND WELFARE FUND, PENSION FUND, AND SUPPLEMENTAL
SICK PAY PLAN..............................................................................................................11

**ARTICLE X**
SENIORITY ......................................................................................................................13

**ARTICLE XI**
LEAVES OF ABSENCE....................................................................................................16

**ARTICLE XII**
NO STRIKE - NO LOCKOUT..........................................................................................16

**ARTICLE XIII**
RIGHT OF VISITATION...................................................................................................16

**ARTICLE XIV**
BULLETIN BOARDS........................................................................................................17

**ARTICLE XV**
GENERAL PROVISIONS & SAVING CLAUSE..............................................................17

**ARTICLE XVI**
SHOP STEWARDS...........................................................................................................18

**ARTICLE XVII**
MANAGEMENT PREROGATIVE - NON DISCRIMINATION..................................18

**ARTICLE XVIII**
WORK RULES..............................................................................................................19

**ARTICLE XIX**
GRIEVANCE PROCEDURE.......................................................................................20

**ARTICLE XX**
ARBITRATION ...........................................................................................................20

**ARTICLE XXI**
CHRISTMAS TURKEYS ............................................................................................21

**ARTICLE XXII**
FUNERAL LEAVE .......................................................................................................21

**ARTICLE XXIII**
SUPERVISORS WORKING.........................................................................................22

**ARTICLE XXIV**
SAFETY COMMITTEE................................................................................................22

**ARTICLE XXV**
TERMINATION AND RENEWAL...............................................................................22

**EXHIBIT "A" MARKET BASED PAY RATES** .........................................................25

**12-HR MAINTENANCE PROGRAM** ...........................................................................26

**MEMORANDUMS OF UNDERSTANDING**..................................................................27

# AGREEMENT

THIS AGREEMENT shall be effective as of January 9, 2016, by and among ALUMINUM SHAPES LLC situate at 9000 River Road, Delair, New Jersey, their successors or assigns (hereinafter collectively called the "Company") and TEAMSTERS LOCAL NO. 107 (hereinafter called the "Union").

## WITNESSETH:

The parties hereto, in consideration of their mutual promises, covenants and agreements as hereinafter set forth, agree as follows:

## ARTICLE I

### RECOGNITION OF UNION

(a) The Company recognizes the Union as the exclusive bargaining agent for all of the Company's production and maintenance employees employed by the Company at its plant located at 9000 River Road, Delair, New Jersey, excluding guards, watchmen, professional employees, clerical employees, office employees, engineers, salesmen and supervisors as defined in the National Labor Relations Act of 1947, as amended.

(b) Whenever the word "employee" appears hereafter in this Agreement, it shall mean only those employees for whom the Union is, in the preceding paragraph of this Article, recognized as the exclusive bargaining agent.

## ARTICLE II

### PROBATIONARY PERIOD

(a) The Company shall have the right to hire new employees from any source whatsoever. All new employees shall be on probation for one hundred twenty (120) days after employment and, during such probationary period, the Company shall be the sole judge as to whether or not such new employee is qualified to continue in its employ. No grievance may be filed over the termination of a probationary employee.

## ARTICLE III

### UNION SECURITY AND CHECK-OFF

(a) It shall be a condition of employment that all employees of the Company covered by this Agreement who are members of the Union in good standing on the execution date of this Agreement shall remain members in good standing, and those who are not members on the execution date of this Agreement shall, on the thirtieth (30th) day following the execution date of this Agreement, become and remain members in good

1

standing in the Union. It shall also be a condition of employment that all employees covered by this Agreement and hired on or after its execution date shall, on the thirtieth (30th) day following the beginning of such employment, become and remain members in good standing in the Union.

(b) During the life of this Agreement, the Company will check off monthly dues, assessments and initiation fees as membership dues in the Union, provided it receives individually signed, voluntary check-off authorization cards in a form satisfactory to the Company.

(c) All money deducted under the provisions of the preceding paragraph shall be promptly remitted by the Company to the Financial Secretary-Treasurer of the Union.

(d) The Union shall indemnify and save the Company harmless against any and all claims, demands, suits or other form of liability that shall arise out of or by the reason of action taken or not taken by the Company for the purpose of complying with any of the foregoing provisions.

(e) The Company will check off monies from an employee's pay check as a contribution to "Teamsters Local 107 Political Action Committee", provided it receives individually signed, voluntary check-off authorizations in a form satisfactory to the Company.

## ARTICLE IV

### HOURS OF WORK

(a) It is expressly understood that the provisions of this Article are intended only to provide a basis for calculating time worked and shall not be a guarantee as to the hours of work per day or days of work per week or as a guarantee of working schedules.

(b) **8 Hour Shifts.** The regular work week shall consist of not more than forty (40) hours on a schedule of not more than eight (8) hours per day between Monday and Friday inclusive, with overtime pay after forty (40) hours of work in the week.

1. If an insufficient number of employees indicate their availability to work such schedule, the Company may assign qualified employees to the schedule in reverse order of their department seniority all other factors being equal.

2. The Company may have different schedules for different departments or work groups within a department.

3. Meals and breaks. 8 hour shift employees shall be permitted no less than thirty (30) minutes of breaks and meal periods during any shift. The parties agree that the current break and meal period schedules in the various departments and work groups shall be continued unless the parties agree otherwise. Break periods may be staggered within a crew to ensure continuity of operations, and the shop steward shall be consulted on that schedule if it is to be changed.

2

4. The regular work week is defined herein for purposes of straight time and overtime pay computations and no inferences shall be drawn therefrom to prevent the Company from scheduling a reasonable amount of overtime in accordance with the provisions of this Agreement.

5. All work performed on Saturdays and Sundays shall be compensated at the rate of time and a half; provided, however, that the employee has worked his entire straight-time schedule that week. Vacation time that is scheduled at least seven (7) days in advance, and holidays, so long as the employee has satisfied the work requirements regarding work on the regularly scheduled days before and after the holiday, will be considered as time worked for the purposes of calculating overtime.

6. Hours worked are credited to the day on which the out punch occurs.

(c) **12 Hour Shifts.**  The work week is defined Sunday to Saturday. The regular work week shall consist of not more than forty eight (48) hours on a schedule of not more than twelve (12) hours per day, with overtime pay after forty (40) hours of work in the week.

1. The Company may have different schedules for different departments or work groups within a department.

2. Meal and Breaks

    a. There will be one 30 minute paid meal break during each 12 hour shift

    b. There will be two ten minute breaks during each 12 hour shift.

    c. The parties agree that the current break and meal period schedules in the various departments and work groups shall be continued unless the parties agree otherwise.  Break periods may be staggered within a crew to ensure continuity of operations, and the shop steward shall be consulted on that schedule if it is to be changed.

3. The regular work week is defined herein for purposes of straight time and overtime pay computations and no inferences shall be drawn therefrom to prevent the Company from scheduling a reasonable amount of overtime in accordance with the provisions of this Agreement.

4. All hours worked over 40 in a given week shall be paid at a rate of time and one half. Vacation time that is scheduled at least seven (7) days in advance, and holidays, so long as the employee has satisfied the work requirements regarding work on the regularly scheduled days before and after the holiday, will be considered as time worked for the purposes of calculating overtime.

5. Hours worked are credited to the day on which the out punch occurs.

(d)  When daily overtime work is required, the employees who regularly perform the work involved during the regular work hours shall be given preference.  If there are not a sufficient number of such employees, the overtime will be offered to other employees then at the plant who are within the affected work group and who are qualified to perform the work, in the following order: Leader(s), then other full time employees, in order of seniority.  When overtime is required, the Company shall offer the work in order of seniority to employees in the work group involved who have the necessary skill and ability to perform the job.  If an insufficient number of employees indicate their availability to work such overtime, the Company may assign the work to qualified employees in reverse order of their department seniority.

(e)  When, in the opinion of the Company, it is necessary to work overtime, employees entitled to such work, as hereinabove provided, shall be given at least four (4) hours' advance notice thereof, except that in the case of Saturday work for the second and third shifts, the advance notice shall be given not later than the end of the employee's shift on Thursday, and in the case of Sunday work for the second and third shifts, the advance notice shall be given no later than the end of the employee's shift on Friday and in the event such notice is given as above, the employee or employees shall be expected to work a reasonable amount of overtime, except for good and sufficient cause.  Employees shall not be compelled to (but, if requested to do so by the Company, may at their own discretion work more than ten (10) consecutive hours, exclusive of the lunch period, in any twenty-four (24) consecutive hour period, or more than forty-eight (48) hours or more than six (6) days in any work week, which shall be construed to mean 12:01 a.m. Sunday, or the start of the shift that begins on Saturday and ends on Sunday, through 11:59 p.m. Saturday, for payroll purposes only. The daily limit of ten (10) consecutive hours does not apply to those employees assigned to shifts where the regularly scheduled work day is twelve (12) hours. For employees whose regularly scheduled work day is 12 hours, these employees shall not be compelled to, but if requested to do so by the Company may at their own discretion, work more than twelve (12) consecutive hours.

(f)  The Company shall have the right to schedule a reasonable amount of mandatory paid training time during any workweek.  Any such scheduled training time shall not be counted towards the limits provided for in section IV (e).

(g)  In the event of plant shutdown or closures of more than one day, if the Company needs employees to work prior to resuming full operations, it shall seek volunteers, and select them in order of seniority, all other things being equal, including skill and ability to do the job required.  If no volunteers or insufficient volunteers are interested in the work, the company shall have the right to assign the work in inverse order of seniority.

4

## ARTICLE V

### HOLIDAYS

**8 hour shifts**

(a)  The following holidays shall be recognized: the day before New Year's Day, New Year's Day, Martin Luther King's Birthday (as determined by the U.S. Government), Good Friday, Memorial Day, July Fourth, Labor Day, Thanksgiving Day, the day after Thanksgiving, the day before Christmas, Christmas, and the employee's birthday.   If any of the above holidays falls on a Sunday, the Sunday shall not be considered a holiday, but the next day shall be considered as the holiday.  If any of the above holidays falls on a Saturday, said Saturday shall be regarded as the holiday, but the Company shall have the right, by notification to the employees, to shut down the plant on the Friday immediately preceding the holiday.  Should Christmas Day fall on a Sunday or Monday, Saturday before same shall be celebrated as the Day before Christmas unless the Company, by notification, chooses to shut down the plant on the preceding Friday. Should Christmas Day fall on a Sunday or Monday, Saturday before the same shall be celebrated as the day to shut down the plant on the preceding Friday.  If a holiday falls on a Monday or is celebrated on a Monday, work on the Saturday preceding the holiday shall be considered optional on the part of the employee in the event the employee desires to take a long weekend.   Nothing shall relieve the employee of the responsibility of working the Tuesday subsequent to the holiday to retain his eligibility therefor.  The Company and the Union shall jointly designate at the beginning of each year those dates that will be celebrated as the above holidays for purposes of this Agreement.

(b) An employee shall receive pay of eight (8) hours at his basic straight-time rate for such holiday, provided he has completed his probationary period and provided such employee has worked the lesser of seven (7) hours or his scheduled hours on both his scheduled work day before the holiday and his scheduled work day after the holiday, unless the employee is prevented from doing so due to an injury he suffered on the job within the preceding four (4) weeks.  Where holidays occur on two succeeding days, if the employee fails to satisfy the work requirement on his scheduled day before the holidays, he will not receive holiday pay for the first holiday. If the employee fails to satisfy the work requirement on his scheduled day after the holidays, he will not receive holiday pay for the second holiday.  If the employee does not satisfy this work requirement before and after the holidays, he will not be entitled to pay for either holiday.

5

(c)    Should any of the said holidays occur during the vacation period of any employee, and should such employee be entitled to holiday pay, he shall take such holiday on the workday immediately following his vacation period or be paid for same at the straight time rate.

(d)  Employees shall not be required to work on a holiday, but any employee who has accepted an assignment to work on a holiday and then fails to report for and perform such work without reasonable cause (which shall include illness), shall not receive pay for such holiday.  Employees who work on the holiday shall receive, in addition to holiday pay, pay at time and one-half for all hours so worked.

## 12 hour shifts

(e) The same holidays recognized in section (a) above shall also be recognized for employees on twelve (12) hour shifts, however, some of these holidays will be "working" holidays. Twelve-hour employees will not be required to work on New Year's Day, Easter Sunday, July Fourth, Thanksgiving Day and Christmas Day. All other holidays provided for under the contract will be considered "working holidays" for those shifts scheduled to work on those days regardless of whether the holiday may fall on a Saturday or Sunday.

(f) All hours worked on a "holiday", including birthdays, will be paid at time and one half plus 8 hours of straight time holiday pay; non-working holidays will be paid at 8 hours of straight time.

(g) To receive holiday pay an employee must have completed his probationary period and must have worked the lesser of ten (10) hours or his scheduled hours on both his scheduled work day before the holiday and his scheduled work day after the holiday, unless the employee is prevented from doing so due to an injury he suffered on the job within the preceding four (4) weeks. Where holidays occur on two succeeding days, if the employee fails to satisfy the work requirement on his scheduled day before the holidays, he will not receive holiday pay for the first holiday. If the employee fails to satisfy the work requirement on his scheduled day after the holidays, he will not receive holiday pay for the second holiday.  If the employee does not satisfy this work requirement before and after the holidays, he will not be entitled to pay for either holiday.

## ARTICLE VI

### WAGES

(a) SEE EXHIBIT "A"

(b) All Employees in the bargaining unit will receive a $250 signing bonus in a separate live check within 30 days of the ratification of this agreement.

| | |
|---|---|
| June 5, 2016 | 3% increase to all wage rates |
| June 4, 2017 | 2% increase to all wage rates |
| June 3, 2018 | 2% increase to all wage rates |
| June 2, 2019 | 2% increase to all wage rates |

(c) The Company may designate one or more production and maintenance employees from the bargaining unit as "Leader", it being understood that any employee so designated shall not be recognized as being a Supervisor, Foreman or Assistant Foreman, and such employee shall not have the authority to hire or fire employees, discipline or discharge employees, nor shall he recommend that the Company hire employees or that employees be disciplined or discharged. A Leader shall be an employee who shall perform all the duties of other employees in the group and with instruction from his Supervisor or Foreman, shall have the power to assign work, instruct employees, correct any faulty work and faulty work procedures (and shall report same to his immediate Supervisor), outline work procedures and interpret plans and specifications. Furthermore, it is understood and agreed that all of the provisions of this Agreement shall apply to any employee who is designated as a Leader in accordance with the provisions hereinabove set forth. Leaders shall receive two dollars and fifty cents ($2.50) per hour above his then current rate to accept the Lead position. The Job Description is attached hereto.

(d) The Company may continue its practice of appointing Leaders in those departments and classifications on an as needed basis. However, nothing shall be construed to take away or cut down the right of the Company to appoint or not to appoint Leaders on its own in any classification or department the Company deems necessary. The Union shall always be free to discuss such problem with the Company informally or through the Grievance Procedure. A Leader shall be considered senior to all employees in his department, except stewards, for purposes of overtime assignments.

(e) Notwithstanding any institution of departments, the Company shall continue to have the same flexibility regarding the assignment of work and the transfer of employees in the plant as at present.

(f) The Company may, at any time, temporarily assign any employee to a class of work other than that on which he is normally employed for a period not to exceed thirty (30) days.  Any employee so temporarily assigned to a class of work for which the minimum wage rate herein specified is higher than his regular wage rate, shall thereafter receive the higher wage rate while engaged in that work.  Where skill and ability to perform the job are comparable, the Company will make all temporary assignment decisions based on seniority.

(g) Any employee temporarily assigned to a class of work for which the minimum wage rate herein specified is lower than his regular wage rate shall, while engaged on such temporary assignment, be, nevertheless, paid his regular wage rate.

(h) The hiring and departmental minimum hourly rates of pay set forth in this Agreement are minimum rates and nothing herein contained shall be construed as limiting the Company from paying wages in excess of these rates to individual employees for length of service, or whose proficiency or ability to perform the job merits such added consideration; provided, however, the Company informs the Union, in writing, of the names of its employees who are granted such increases, the amount of the increases and the effective date thereof.

(i) The Company will use its best efforts to see to it that all pay checks shall be distributed no later than three (3) hours prior to the end of the shift on any regularly scheduled pay day.  If the employee gives the Company sufficient notice on a regularly scheduled pay day that he must leave the plant prior to the end of his shift and does so with the permission of his Supervisor, the said employee shall receive his pay check on departure.  In the event an employee is absent because of illness, if he is due a pay check, the pay check may be picked up by him or, by written authorization form, by an employee, any weekday in the Company Pay Office, between the hours of 9:00 a.m. to 5:00 p.m., or at the employee's request, mailed.  Upon actual termination of employment, pay shall be payable only on the regularly scheduled pay day, which is generally Friday, at the Company Pay Office, between the hours of 9:00 a.m. and 5:00 p.m.

(j) All employees who regularly work on the second shift shall receive a shift premium differential of thirty-five cents (35¢) per hour.  All employees who regularly work on the third shift shall receive a shift premium differential of thirty cents (30¢) per hour.

(k) Direct Deposit.  All new employees will receive pay via direct deposit.  Direct deposit payroll stubs will be mailed to the employees address then on file.

8

## ARTICLE VII

### REPORT-IN PAY

(a) When an employee reports for work at his regularly specified time without previous notice to the contrary by the Company, and is not permitted to commence working, he shall be compensated for at least four (4) hours' time at his base rate hourly pay. Any employee who is permitted to commence working shall receive the minimum of four (4) hours pay as above. Any employee who is notified to report for work at a time other than the regularly specified time and is not permitted to commence working shall receive a minimum of four (4) hours pay as above. Employees assigned to shifts where the regularly scheduled work day is twelve (12) hours will be afforded the same protections as above, except that the minimum paid hours will be six (6).

(b) Any employee injured in the Company's plant, who is sent to a doctor and returns to work during his regular working hours on the same day, shall be paid by the Company the applicable wage rate for such time thereby lost on such day by such employee. The transportation of such employee to the doctor's office and/or hospital on the day of the injury and every visit thereafter which the said employee makes from the plant to the doctor's office or hospital, and returns, shall be in transportation provided by the Company. If an employee injured in the Company's plant and provided with transportation to and from the doctor's office and/or hospital on the day of injury is thereafter immobilized, then every visit that the said employee makes to the doctor's office and/or hospital from the employee's home shall be accompanied by an allowance for his bridge fare, if any, if he lives in Philadelphia; in addition, he shall be allowed a transportation allowance equal to the then current IRS mileage rate for the mileage to and from his home, or the Company will provide the transportation.

(c) The Company shall furnish a medical van to take injured employees in emergencies to the doctor or hospital.

## ARTICLE VIII

### VACATION AND PERSONAL TIME

__Vacation__

(a) All employees who have at least one (1) year of service shall be eligible to receive paid vacation time off according to the following schedule:

| After "X" years of service | Vacation Hours |
|---|---|
| 1 | 48 |
| 3 | 96 |
| 10 | 144 |
| 16 | 192 |
| 20 | 240 |

\* If an employee will reach a new service level (3, 10, 16 or 20 years) during a given calendar year, the employee's vacation allotment for that calendar year will be equal to the hours of the new level, and will be available to the employee on January 1 of that calendar year. Employees reaching the first service level (1 year) in a given calendar year will receive 48 hours of vacation for that calendar year, but will not receive the allotment or be eligible to take any vacation until they have actually completed one (1) year of service, as stated in (a) above.

(b) Vacation Pay Out:  Employees shall be afforded the opportunity to "sell" or cash out, up to 40 hours of accrued and available vacation time at the end of the year at the hourly rate that they are then being paid.

- *Employees also may choose to roll over un-used hours under this up to the maximum of 60 hours.*

(c)  Vacation Scheduling:  Vacation may be taken in one day blocks, but should be scheduled seven (7) days in advance just as vacations are currently.

With the prior approval of the Supervisor and Human Resources, Vacation time may be taken in half day increments.

Employees are encouraged to schedule vacation time in 1-2-week blocks, and well in advance in order to ensure that employees' needs and the business needs of the Company are both accommodated.  This enables us to properly schedule crews around the vacations or planned absences of employees,

The Company will distribute vacation request forms to each employee, and within 60 days will try to inform employees if their vacation requests can be accommodated, just as they have previously with vacations.

The Company will ascertain from each employee his choice of vacation period and will endeavor to permit each employee to take his vacation at the time chosen by such employee, preference on choice to be governed by seniority.  It is understood, however, that vacation time must be arranged to suit the Company's production schedules and the final determination for the time of taking the vacation shall be left to the Company, including the decision as to whether a third week or more of vacation is to be consecutive.  The Company, if it so chooses, may close down the plant or any department for one or two weeks, in which event all employees in the plant or department, as the case may be, **must first take their vacation time**.  In such event, the Company shall post the date of the proposed plant shutdown or departmental shutdown no later than May 1st of the vacation year.  Should the Company have a plant shutdown or departmental shutdown and then find it necessary that certain work be performed in the plant or department, nothing shall prevent the Company from proceeding to have such work performed.  Should the Company find it necessary to eliminate any months from June 1st to December 31st for vacation periods, due to the stresses of production and the necessity to

produce work, such notice must be posted by the Company no later than May 1st of the vacation year, in the same manner as a proposed plant or departmental shutdown.

(d) Any employee who, at the time of a request to sell back vacation is made, has an "active" first level or higher attendance warning in effect will not be allowed to sell back his vacation. This limitation may be waived with the agreement of the HR Director.

The Company may give consideration to cases of extreme personal hardship.

(e) Any vacation pay or other wages due and owing to a deceased employee at the time of his death shall be paid to the employee's named beneficiary, provided the employee has so informed the Company in writing to that effect, but any such payment may only be made in accordance with the laws of New Jersey governing same.

(f) Employees should endeavor to schedule their yearly allotment no later than March 15th of each year. By August 15th of each year, remaining vacation time must be scheduled by the employee, or the remaining time will be scheduled by the department head based on business needs, provided, however, that an employee may retain as many as twenty four hours of vacation time to be scheduled with the concurrence of the Company when the employee wishes to use those days.

(g) An employee shall be considered to be unavailable for work beginning at the end of his last scheduled workday (including any overtime that day) preceding his scheduled vacation until his next regular scheduled day of work following his vacation.

## Personal Time

(a) All employees who have completed their probationary period by January 1 of a given year shall receive three (3) paid personal days (paid at 8 hours per day) to use during the calendar year.

## ARTICLE IX

## HEALTH AND WELFARE FUND, PENSION FUND, AND SUPPLEMENTAL SICK PAY PLAN

(a) Commencing with the contribution to be paid for July 1st, 2016, the Company agrees to make a monthly contribution to the Local 837 Health and Welfare Fund in an amount equal to $1,044.24 (10% more than the current fee of $949.31) to account for increased costs, for each employee who has completed his probationary period and was actively at work during the preceding month, except those who quit or were discharged. The Company shall have no obligation to continue to make contributions to the Health

and Welfare Fund on behalf of an employee who has been absent from work for one (1) year due to a work-related injury or illness.

b) The amount of the Company's monthly contribution for each employee shall increase, effective July 1, 2017 and each succeeding year until the end if this contract by no more than 10%, as necessary to maintain in effect the benefits then being provided to such employee by the Health and Welfare Fund.

c) Existing employee payroll deduction rates will continue unchanged until July 1, 2016. Commencing on July 1, 2016, the Company shall deduct $29.50 per week for each employee that has successfully completed his probationary period. The amount of the weekly payroll deduction for each employee shall increase, effective July 1, 2017 and each succeeding year until the end of this contract by no more than 10%, equal to the percentage increase in the paragraph above, as necessary to maintain in effect the benefits then being provided to such employee by the Health and Welfare Fund.

d)    (b)  As of the effective date of this Agreement, the Company will contribute on behalf of each eligible employee then on the payroll 3.0% of the employee's gross wages to a defined contribution plan to be established by the Trustees of the Local 837 Pension Plan. The parties hereto acknowledge and agree that the amount so contributed shall be deposited in an account in the name of each such eligible employee in such plan, which will be a defined contribution pension plan qualified under the provisions of Section 401(a) of the Internal Revenue Code of 1986, as amended ("Code"). In no event shall this plan be subject to the employer withdrawal liability or minimum funding obligations imposed on defined benefit plans pursuant to the Employee Retirement Income Security Act of 1974, as amended (ERISA"), or the Pension Protection Act. The parties hereto further acknowledge and agree that the Company will have no additional obligations or liability with respect to the provision of retirement benefits to each eligible employee, except to make the contributions described in this Section (b).

In connection with such a defined contribution plan, the Union acknowledges and agrees: (1) that the defined contribution plan whether existing or to be established pursuant to this Agreement will be operated in accordance with its terms and the administration thereof will be in compliance with the requirements of any and all applicable statutes, orders or governmental rules or regulations currently in effect, including, but not limited to, ERISA and the Code; (2) that the defined contribution plan and its related trust is intended to qualify under Section 401(a) and Section 501(a) of the Code and it will make all efforts to ensure such qualification; (3) that, unless a determination letter presently exists for the defined contribution plan, the Union will exert its best efforts to have the administrator of such defined contribution plan submit a determination letter application to the Internal Revenue Service for such plan.

e)  (c)  The following benefit will be paid only once, in any contract year, to an eligible employee, irrespective of the number of illnesses suffered by the employee. An employee is eligible to receive the Supplemental Sick Pay Benefit hereafter set forth only under the following conditions:

(i) The employee must have completed two (2) years of service with the Company prior to the onset of the employee's illness.

f) (ii) The employee is absent from work for one full week because of illness and thereafter receives consecutively from the State five (5) weekly disability benefit checks after having been absent because of illness for six (6) consecutive weeks, including the first week for which no payment was made.

(iii) Upon the employee's return to work, the Supplemental Pay Benefit shall be paid to the said employee, at the end of the first week of the employee's return to work.  Should the employee fail to work the full week of the employee's return, the said payment need not be paid.

(iv) The paid Supplemental Sick Pay Benefit shall consist of forty (40) hours' pay at the employee's straight-time hourly rate.

(v)  The Company reserves the right to have its own doctor examine a sick employee at the end of two (2) consecutive weeks of disability benefits payments made by the State to ascertain whether the employee is fit to return to work prior to the end of the third (3rd) week of payments.  Should the Company doctor find the employee is able to so return, but should the employee fail to do so, the Company shall not be obligated to pay the said Supplemental Sick Pay benefit. Should the Union disagree with the doctor's opinion, the Union reserves the right to take such medical issue through the Grievance and Arbitration procedures.

## ARTICLE X

## SENIORITY

(a)  Each employee's seniority shall consist of his length of service, provided he has the skill and ability to perform the work required.  As so defined, seniority shall be on a departmental basis within the departments set forth in Exhibit "A" and shall govern layoffs, recalls to work after layoff, and promotions.

(b) An employee's seniority shall be considered ended if such employee:

(i) Quits, or

(ii) Is discharged for cause, or

(iii)  Fails to return to work within three (3) days after being notified that work is available, or

(iv)  Is absent for more than three (3) consecutive days on which he is scheduled to work without proper notification and the furnishing of a reason satisfactory to the Company, or

13

(v)  Is on continued layoff for one year or more, unless the employee has five (5) or more years of seniority but less than ten (10), in which case the layoff must be for eighteen (18) months before seniority is lost, and if the employee has ten (10) years or more of seniority, the layoff must be for two (2) years before seniority is lost.

(vi)  Is absent from work for one (1) year due to a non-work related disability, or two (2) years in the case of a work-related disability.

Each employee assumes complete responsibility for maintaining his correct address with the Company's Personnel Department.  The Company will have fully discharged its responsibility to notify an employee to return to work if notice to return to work is given to an employee by certified mail or by any other means at the address shown on the Company's records.  An employee whose seniority is ended pursuant to the above shall cease to be an employee of the Company.

(c)  In the event of a vacancy in a permanent job within the bargaining unit resulting from an increase in the work force, or the creation of a new job, any of which the Company elects to fill from within the plant, the Company shall, after making the initial determination among any applicants in the plant as to which applicant has the skill and ability to fill the vacancy or to do the new job, select from among applicants who have, in the Company's discretion, equal skill and ability to perform the job, the most senior applicant. In order to notify individuals within the bargaining unit of the availability of a permanent job vacancy, the Company will post notices regarding the existence of the vacancy and the timelines for applying for the job vacancy. Notices will be posted in the Delair Group plant, Aluminum Shapes plant and in the corporate Human Resources Office. All job posting notices will remain posted for at least three (3) but no more than five (5) working days.  Should the Company, consistent with the provisions of this paragraph, select an employee from within the bargaining unit to fill the permanent job vacancy, the Company will so notify the Chief Shop Steward or the appropriate departmental shop steward of its decision within five (5) working days.  In the event no applicant, in the Company's discretion, has the skill and ability to perform the job, the Company shall have the right to hire a new employee to perform the same; provided, however, that if the said job involves a period of training, then the Company shall, before offering such training to a new employee, offer the said training first to any applicant within the bargaining unit.  It is the intent of the Company to fill vacancies and upgrade employees from within the plant before hiring new employees from the outside for such positions, and the Company agrees to make every effort to follow this philosophy within the confines of this paragraph.

Any employee promoted as above shall have a thirty (30) day trial period, which the Company, in its discretion and in consultation with the Chief Steward, may extend up to an additional sixty (60) days (maximum total of ninety (90) days).  If the employee is retained in the job beyond fifteen (15) days, the employee shall then receive the rate for the classification to which he was promoted; should he thereafter be demoted during the remainder of the trial period from the said classification because of lack of requisite skill and ability to perform the job to continue to do the job, he shall, upon such demotion, receive the rate of the job to which he is returned. Classification rates for all new or open

positions posted or filled by the Company shall be based on the applicable minimum rates for employees hired on or after January 1, 2005 as per Exhibit A.

An employee who is promoted into a new department or classification before having reached the end of the wage progression for his then current position shall have his rate, as calculated under Article VI, Section (d), adjusted so that the employee's applicable rate thereunder will then be based on his length of service with the Company. For example, should an Extrusion Helper with 12 months of service with the Company successfully bid on the position of Delgard Operator in the Fabrication Department, his hourly rate of $10.00 (12 month rate for Extrusion Helper) would increase to $12.52 (12 month rate for Delgard Fab Operator) and his wage progression going forward would be as a Delgard Operator in the Fabrication Department per Exhibit B. The employee who is the successful bidder shall not be able to bid out of that position or at least one (1) year after entering the bid position.

Notwithstanding anything to the contrary stated in this section, in the event of a layoff, the plant wide seniority of any employee shall govern his right to remain in or replace any other employee, if he chooses to do so in lieu of accepting a layoff, in the jobs of Fab Operator (Punch and Saw) in the Fabrication Department, Helper in the Extrusion, Fabrication and Delair Departments, Press Crew (limited to Die Head Man) in the Extrusion Department, Packers in the Shipping Department, the jobs of Billet Saw Operator, Crane Operator and Pit Operator in Foundry Department and all jobs in the Paintline Department except for Water Treatment Room Operator. With regard to moving into these department and jobs only, seniority shall be, in effect, on a plant-wide basis, with the provision that the transferring employee will be paid the lower pay rate applicable. Moreover, if at any time an employee about to be laid off accepts a lower-rated job in lieu of a layoff, the said employee will continue to accumulate seniority in the department from which the employee was laid off, so that if work opens up in the said department, the employee will be transferred, at the employee's request, to the old department prior to the Company's hiring a new employee in the said department.

In addition, in the event an employee bids into or is transferred to a higher-rated job, in a department other than the employee's department, the said employee may be junior in the new department, but will continue to accrue seniority in the former department, for purposes of layoff. Thus, in the event of a layoff in the new department, the employee will retain the applicable seniority rights in the former department as fully as though the employee had not bid into or transferred into a new department.

Should an employee, at the employee's request, be permitted to transfer to and perform a lower-rated job because of age or health reasons, the said employee's former departmental seniority rights shall, in this one instance, be added to the seniority accumulated in the new department for purposes of layoff.

Finally, should an employee be transferred to a higher-rated job in which the employee had prior experience, the employee shall receive the new higher rate after performing the job for fifteen (15) days.

(d) Should an employee desire to transfer from the second or third shift to day shift, the Company agrees to give consideration to such requests on the basis of seniority involved where personal circumstances require the employee to make such change. In such an event, the Company will, prior to hiring any new day shift employees, offer to such an employee the opportunity to transfer to day shift, provided the transfer does not interfere with the efficient operation of the plant and the principle that it is necessary to have experienced senior personnel on all shifts.

(e) In the event an employee is promoted out of the bargaining unit, he shall continue to preserve his seniority within the bargaining unit for a period of one hundred twenty (120) days from such promotion, at the expiration of which period his seniority shall terminate. In the event he is demoted during the said thirty-day period, he shall exercise his full seniority right up to the time of his promotion to transfer back into the bargaining unit.

## ARTICLE XI

### LEAVES OF ABSENCE

(a) Leaves of absence, without pay, shall be granted by the Company to any employee for reasonable cause without prejudice to the employee's seniority or other rights. Application for leave of absence must be made in writing to the Company's Personnel Office and be approved in writing by such Company representative. A copy of the employee's application and approval thereof shall be given to the Shop Steward. Generally, such leave of absence will be for a period of not more than thirty (30) days, but it may be extended for reasonable cause by mutual agreement between the Company and the Union. Any employee elected or appointed as a Union Officer or a delegate to any labor activity necessitating a leave of absence not in excess of thirty (30) days, may likewise be granted such leave of absence without pay. Employees granted leave of absence shall be re-employed by the Company at the end of such leaves if work is available, in accordance with their accumulated seniority and, in any event, shall be re-employed as soon as work is available in accordance with such employee's seniority status. Any employee who while on leave of absence obtains employment with another employer, without having obtained prior permission to do so from the Company and the Union, shall be subject to discharge.

## ARTICLE XII

### NO STRIKE - NO LOCKOUT

(a) There shall be no strikes or lockouts during the term of this Agreement.

## ARTICLE XIII

### RIGHT OF VISITATION

(a) An authorized officer or representative of the Union shall have access to the plant during business hours, upon reasonable advance notification to the Company, for the purpose of participation in the adjustment of disputes and grievances and for the basic purpose of effectuating the provisions contained in this Agreement.

## ARTICLE XIV

### BULLETIN BOARDS

(a) A bulletin board shall be made available by the Company for the exclusive use of the Union for posting of Union notices relating to the appointments of committees, election of officers, other business, and job postings.

## ARTICLE XV

### GENERAL PROVISIONS AND SAVINGS CLAUSES

(a) It is assumed by the parties hereto that each provision of this Agreement is in conformity with all applicable laws of the United States and the State of New Jersey. Should it later be determined that it would be a violation of any legally effective governmental or state order or statute to comply with any provision or provision of this Agreement, the parties hereto agree to renegotiate such provision or provisions of this Agreement for the purpose of making such provision or provisions conform to such governmental or state order or statute so long as they shall remain legally effective and the other provisions of this Agreement shall not be affected thereby.

(b) Amendments. Any change or amendment to this Agreement shall be in writing and duly executed by the parties hereto, including the Chief Steward and at least one other signatory bargaining committee member, and the Director of HR and Plant Manager.

(c) Past Practices. Any and all agreements, written and verbal, previously entered into between the parties and not specifically incorporated herein, are mutually cancelled and superseded by this Agreement.

(d) Complete Understanding. The parties acknowledge that, during the negotiations which resulted in this Agreement, all had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining, and that the understandings and agreements arrived at

by the parties after the exercise of that right and opportunity are set forth in this Agreement.

(e) The parties further agree, however, that this Agreement may be amended by the mutual consent of the parties in writing at any time during its term.

## ARTICLE XVI

### SHOP STEWARDS

(a) The Company recognizes the right of the Union to designate and/or elect a reasonable number of Shop Stewards.

(b) Authority of Shop Stewards so designated and/or elected by the Union shall be limited to and shall not exceed the following duties and activities:

    (i) The investigation and presentation of grievances in accordance with the provisions of this Agreement.

    (ii) The transmission of such messages and information which shall originate with and are authorized by the Union or its officers, provided such messages and information have been reduced to writing, or if not reduced to writing, are of routine nature and do not involve work stoppages, slowdowns, refusal to handle goods and other interference with the Company's business.

(c) Shop Stewards have no authority to take strike action or any other action interrupting the Company's business except as authorized by official action of the Union.

(d) Employees designated or elected as Shop Stewards shall, while holding such position, be recognized, for purposes of layoff and shift preference, as having length of service in excess of any other employee in his department, provided that the said Steward has the skill and ability to perform the remaining work to be done in the department.

## ARTICLE XVII

### MANAGEMENT PREROGATIVE - NON DISCRIMINATION

(a) Except to the extent expressly abridged by specific provision of this Agreement, the Company reserves and retains, solely and exclusively, all of its inherent rights to manage its plant and business as such rights existed prior to the execution of this or any other previous agreement with the Union. It is understood that the management of the plant and business and the direction of the working forces, including but not limited to,

18

the right to hire, suspend, discharge or demote, all for just cause, or transfer, and the right to relieve employees from duty because of lack of work or other legitimate reasons, and the right to initiate, continue, terminate or modify bonus and incentive wage plans, is vested exclusively in the Company.

(b) The Company is an equal opportunity employer and shall not unlawfully discriminate against employees or job applicants on the basis of race, creed, color, religion, sex, national origin, ancestry, age, veteran's status or liability for service in the Armed Forces of the United States, disability or handicap, affectational or sexual orientation, marital status, pregnancy or any other status or condition which is protected by applicable federal, state or local law, except where a bona fide occupational qualification would apply. The Company will recruit, hire, train, promote, retain and compensate in a manner consistent with this policy and the terms of this Agreement. The Company will comply with the provisions of the Family and Medical Leave Act of 1993 and the New Jersey Family Leave Act.

## ARTICLE XVIII

### WORK RULES

(a) The Company's "Code of Conduct" and "Revised Attendance Policy - Effective April 1, 2012" are hereby incorporated by reference into this Agreement and may not be changed without the consent and approval of the Union and the Company. The new attendance policy is attached as a side agreement, and the disciplinary policy will be revised with the input of the Labor Management Committee.

(b) Any employee testing positive for the presence of drugs or alcohol in his/her system after a work-related accident or near-miss will be subject to immediate termination. The use of Last Chance Agreements will be discontinued for individuals involved in a work-related accident or near-miss. However, an employee who is not involved in a work-related accident or near-miss and voluntarily self-identifies himself to the Company as having a substance abuse problem will not have his employment immediately terminated provided that the employee voluntarily enters into and completes a treatment program acceptable to the Company and complies with the terms of a Last Chance Agreement. The Company's past practice of "for cause" testing shall remain unchanged and in effect for the term of this Agreement.

(c) The parties agree to work together to establish and implement, by July 1, 2016, a random drug testing program. A basic element of the program will be that, for any employee's first test failure, the employee will not have his employment terminated provided that the employee voluntarily enters into and completes a treatment program acceptable to the Company and complies with the terms of a Last Chance Agreement.

## ARTICLE XIX

## GRIEVANCE PROCEDURE

(a) Should the Union differ with the Company as to the meaning and/or application of the provisions of this Agreement, the said difference shall be settled in the following manner:

1. Any employee who desires to present a complaint or grievance shall, in the first instance, present the matter to the Union Shop Steward for investigation and the said Shop Steward shall, if the complaint seems justified, present the same for adjustment to the representative of the Company designated by it for that purpose. If said parties cannot satisfactorily adjust the matter within twenty-four (24) hours after the grievance is presented to the Company representative, then

2. A Union representative shall, within three (3) days after the grievance is presented in the first step above, submit to a Company representative a formal written grievance regarding the matter in dispute. In the event the parties cannot adjust the matter within three (3) days after the Union representative discusses the grievance with the Company representative, then

3. The Union may submit the matter to arbitration in accordance with the provisions of Article XX, but must do so by notifying the Company in writing within ten (10) days after having discussed the grievance with a Company representative in Step 2 above.

(b) All grievances must be submitted to the Company in step 1 above within four (4) days after the Union or the employee first learns, or should have learned, of a potential violation of this Agreement. In the event the Union or the employee fails to adhere to any of the deadlines set forth above, the grievance shall be void and may not be processed further, and the Company's action may not be challenged further.

(c) In the event an employee discipline is grieved it must be reviewed by the Company within fourteen (14) days of the grievance or it will become void. A Union representative must be available when the matter is reviewed.

## ARTICLE XX

## ARBITRATION

(a) The parties shall attempt to agree upon a person to serve as arbitrator with respect to any grievance submitted to arbitration per Article XVIII.

(b) In the event that the parties are unable to agree upon an arbitrator within twenty-one (21) days after a matter is referred to arbitration, they shall select an arbitrator through the American Arbitration Association pursuant to its labor arbitration rules.

(c) The arbitrator shall conduct a hearing as expeditiously as possible and shall render a decision without undue delay.  A decision of the arbitrator shall be final and binding on all parties.

(d) In conducting hearings, an arbitrator shall afford the parties a full opportunity to present any evidence, written or oral, which may be pertinent to the matter in dispute.

(e) The expenses for the arbitrator shall be borne equally by both parties.

(f) Failure to submit a matter in dispute to arbitration and failure to comply immediately with any arbitrator's decision shall be deemed a violation of this Agreement.

(g) If the decision favors the employee, it shall be retroactive to the date the original complaint was first submitted to the Company.

(h) In the event of a claimed violation of Article XVII (b) (Non-Discrimination) which would also constitute a violation of a federal, state, or local statute, ordinance or regulation, the employee will present all such claims thereunder to the arbitrator, along with his/her claim under Article XVII (b). The arbitrator is hereby authorized to consider and grant all relief, or any portion thereof he deems warranted and appropriate, which could be awarded to the employee by an agency or a court under such statute, ordinance or regulation.


## ARTICLE XXI

### CHRISTMAS TURKEYS

(a)  On the day before Christmas, all employees shall receive a turkey selected and purchased for them by the Company or, at the Company's discretion, a Twenty-Five Dollar ($25.00) certificate for the purchase of a turkey.


## ARTICLE XXII

### FUNERAL LEAVE

(a) In the case of a death in the immediate family (namely, the death of a parent, spouse, child, brother or sister) of any employee, requiring the employee's absence from the employee's regularly scheduled assignment, the employee shall be permitted to take a leave of absence of up to three (3) consecutive calendar days.  Where the employee's normal scheduled work falls within the three day period, the employee will be reimbursed

only for that portion of such period when scheduled for work, it being understood that this benefit is purely a reimbursement benefit and that, for instance, should a death occur during an employee's scheduled vacation, there will be no funeral leave payment for the same.  Satisfactory proof of the relationship of the decedent to the employee, and the death certificate itself, must be submitted by the employee to the Company in order to receive the above reimbursement.

## ARTICLE XXIII

## SUPERVISORS WORKING

(a) Supervisors shall not perform bargaining unit work except in the following situations:  in a resolution of production problems such as engineering changes, product modifications, experimental work, fulfilling urgent customer needs, the training and instruction of production employees, or other urgent customer needs.  The Supervisor will notify the Shop Steward in advance before exercising the Supervisor's rights under this paragraph.  If the Steward is not available, the Supervisor will notify the Steward at the earliest possible opportunity.

## ARTICLE XXIV

## SAFETY COMMITTEE

(a) A Safety Committee may be appointed by the Company and the Company will see to it that such Safety Committee personnel are given first aid training.  The Company will be responsible for transporting anyone injured in the plant to the hospital or to another medical facility for treatment.

## ARTICLE XXV

## TERMINATION AND RENEWAL

(a) This Agreement shall be effective as of the day and year first above written and shall remain in full force and effect until terminated as hereinafter provided.  This Agreement constitutes the sole and complete understanding between the parties and supersedes and replaces the existing agreement between them, namely the collective bargaining agreement that became effective February 1, 2012, which is hereby terminated.

(b) This Agreement, when signed by the officers of the Company and the Union, shall become effective as described above through and including December 31, 2019, and shall continue to remain in full force and effect from year to year thereafter, unless

written notice is given by either party hereto to the other on or before sixty (60) days prior to the annual expiration date requesting that the Agreement be modified or terminated. In the event of such notification, the parties hereto shall immediately confer and negotiate with reference to a new or modified Agreement. Negotiations for a new contract shall commence not later than thirty (30) days from the date of the written notice herein mentioned. In the event that either party notifies the other of its desire to modify this Agreement, this Agreement, subject to such notification shall continue to remain in effect during the period of negotiations until a new Agreement has been reached or until either party shall give the other party one (1) days' notice of cancellation. No other notice of modification or of termination of contract shall be required of either party other than the notice herein specified. In any event, nothing herein contained shall preclude either party from modifying or changing or amending its proposals for a new Agreement.

[Signatures on next page.]

## RATIFICATION AND EXECUTION

This Agreement, which has been ratified by the bargaining unit employees on, January 8, 2016, may be executed in counterparts.


**ALUMINUM SHAPES, L.L.C**

_____
Gary Harvilla, Director - HR

_____
John Suddreth, Director - Operations

_____
Diana Passarelli, HR Generalist

_____
Timothy Hawn, Manager - Foundry

_____
Jessica Thomasson, Operations


**INTERNATIONAL BROTHERHOOD OF TEAMSTERS UNION LOCAL NO. 107**

_____
Shawn Dougherty, Secretary Treasurer/Business Agent

_____
Mike Nugent, Business Agent

_____
Ed Fricker, Chief Shop Steward

_____
Wes Panei, Shop Steward

_____
Ronald Oxendine, Shop Steward

_____
Sherron Gillespie, Shop Steward

# EXHIBIT "A"
# MARKET-BASED PAY RATES

| JOB CLASSIFICATION | WAGE RATE | | | | |
|---|---|---|---|---|---|
| | As of January 9, 2016 | YEAR 1 June 5, 2016 | YEAR 2 June 4, 2017 | YEAR 3 June 3, 2018 | YEAR 4 June 2, 2019 |
| **LEAD MAN** | 19.35 | 19.93 | 20.33 | 20.74 | 21.15 |
| **OPERATOR 1** | 16.85 | 17.36 | 17.70 | 18.06 | 18.42 |
| Press Operator, CNC Troubleshooter, Anodizer, Water Treatment 1, Crane Operator (Foundry), Ransburg (Inspector), Die Setter (Fabrication Only), Casting Operator, Mold, Furnace Pit Operator, Store Room Head, Thermal Break Saw, Die Corrector 1, Metal Saw, Billet Saw, CDL Licensed Driver, MIG/TIG Welder | | | | | |
| **OPERATOR 2** | 15.85 | 16.33 | 16.65 | 16.99 | 17.32 |
| CNC Operator, Die Set-Up (Die Correction), Forklift Only, Crane Only, Saw, Assembler, Press Crew, Die Corrector 2, Punch Press, Water Treatment 2, Yard Jockey | | | | | |
| **PRODUCTION ASSISTANT** | 12.85 | 13.24 | 13.50 | 13.77 | 14.05 |
| Helper, Packer, Utility Man, Store Room Clerk | | | | | |
| **SKILLED TRADES** | | | | | |
| _Electrician_ | | | | | |
| AAA | 27.75 | 28.58 | 29.15 | 29.74 | 30.33 |
| AA | 25.75 | 26.52 | 27.05 | 27.59 | 28.15 |
| 1st Class | 21.75 | 22.40 | 22.85 | 23.31 | 23.77 |
| _Mechanic_ | | | | | |
| AAA | 26.75 | 27.55 | 28.10 | 28.67 | 29.24 |
| AA | 24.75 | 25.49 | 26.00 | 26.52 | 27.05 |
| 1st Class | 20.75 | 21.37 | 21.80 | 22.24 | 22.68 |
| _Welder_ | | | | | |
| AAA | 24.75 | 25.49 | 26.00 | 26.52 | 27.05 |
| AA | 22.75 | 23.43 | 23.90 | 24.38 | 24.87 |
| 1st Class | 19.75 | 20.34 | 20.75 | 21.16 | 21.59 |

## 12-Hour Maintenance Program

**Goal:  Provide round the clock maintenance support for extrusion operations.**

1) For every 4 consecutive shifts worked, there will be 4 consecutive off shifts.
2) Shift Schedule:  Day – 6am to 6pm; Night – 6pm to 6am
3) Schedule for Implementation: First Shift Commences Sunday, October 10, 2004

### *Compensation*

1) Workweek defined as Sunday to Saturday
2) All hours worked in excess of 40 in a workweek will be paid at time and one half
3) Holidays
   a. The Maintenance Department will not be required to work on New Year's Day (January 1st), Easter Sunday, July Fourth Thanksgiving Day (the last Thursday in November) and Christmas Day (December 25th).  All other Holidays provided for under the Contract will be considered "working holidays" for those shifts scheduled to work on those days regardless of whether the holiday may fall on a Saturday or Sunday.
   b. All hours worked on a "holiday" (including birthdays) will be paid at time and a half plus 8 hours of straight time holiday pay; non-working holidays will be paid at 8 hours of straight time.
   c. To receive you holiday pay, you must have worked the lesser of ten (10) hours or his scheduled hours on both his scheduled work day before the holiday and his scheduled work day after the holiday.

4) Meal and Breaks
   a. There will be one 30-minute paid meal during each 12 hour shift.
   b. There will be two 10-minute breaks during each 12 hour shift.

5) All voluntary 12 hour assignments are permanent.  A request for a transfer off a 12-hour shift will be considered only to the extent another non-12 hour position is available and the Company is able to fill the vacated 12 hour assignment.

6) Payroll
   a. Day divide is set for 5pm, that way people that come in early won't have a problem.
   b. The 6pm-6am shift that comes in Saturday night won't get paid those hours until the following week, the hours will get credited to the out punch.

26

# MEMORANDUMS OF UNDERSTANDING

### 1)   <u>Scholarship Fund for Local 107 Members:</u>

The Company shall contribute to the Local 107 Scholarship fund $2 per month per member who is currently receiving H&W benefits.  The company shall work with the union to offset costs in other parts of the contract in order to pay for this enhanced benefit.

### 2)   <u>Outside Contractors:</u>

Before any work that is currently bargaining work is contracted out, the company shall work with the union to allow a proposal to be made to keep the work in house at a cost lower or equal to the cost of contracting the work, all inclusive, and provided that the quality and timeliness of the work is the same.  The union shall be provided 30 day notice of the intent to contract the work.  The parties agree that the time may be shortened or extended by agreement of the parties depending on the exigencies involved in the project, customer demands and scope of the project.

### 3)   <u>Bonus Program:</u>

The parties agree that the company shall continue its discretionary program of awarding employees bonuses when it is satisfied that production needs or customer needs have been met or exceeded. The parties agree that this program does not and has not created an expectation of receipt of the bonus as compensation subject to overtime under the contract or New Jersey wage and hour laws.

The parties agree to create a labor-management committee comprised of 4 representatives from the union and 4 from the company to address the structure of the bonus, and to agree on targets that will reward employee for hitting productivity and quality targets to ensure the continued improvement of the products, and plant performance.  The committee will meet as needed to recommend a structure in the next 45 days, and thereafter meet at least every two months to review the program and discuss and agree on any needed changes.  The company agrees to budget 5% available for the bonus pool.

### 4)   <u>Tool Allowance</u>

In order to replace worn or lost tools needed for the employee's job, the Company shall provide $300 tool allowance annually to anyone required or expected to provide their own tools.  This should facilitate simple preventative maintenance by the press crews as well.  The company reserves the right to provide maintenance personnel additional credit as needed in its discretion without this benefit being construed as "compensation.

5)    <u>Lead Man in the Bargaining Unit:</u>

The Parties agree that the Lead Man job is a critical position in the production process, for both the direction provided to the crew and the work that they perform. Accordingly, the parties agree that the Lead Man is properly in the bargaining unit, and expected to perform bargaining unit work, but is also expected to perform the other duties identified in the job description. For the duration of this Contract, the Company agrees it will not file a Unit Clarification (UC) petition asserting supervisory status of the Lead man based on any of these duties.

6)    <u>Annual Benefits Review and Pension Contributions:</u>

The Parties agree to meet annually to review the next year's benefits cost, and structure, including exploring the company's participation in the benefits and funds administered by the Union, including the Pension Fund administered by the Board of Trustees of the Teamsters Local 837 Pension Fund ("the Pension").

The Company will continue to participate in the Teamster's Defined Contribution Fund, as provided in Article IX until and unless the parties agree to substitute participation in the Pension.

The Union will discuss the possibility of the Company's non-bargaining unit employees participating in the Union's benefits funds on the same terms as the bargaining unit members, subject to plan or trustee approval.

7)    <u>Vacation Check</u>

The Company shall give the employee his vacation check for scheduled vacations at the beginning of the vacation upon request. The employee will provide HR with two weeks notice of this request in order to allow it to be processed correctly.

8)    <u>Cross-Training</u>

The Company and the Union agree that cross training certain personnel is essential to the efficient operation of the plant, and agree establish a training committee with 4 representatives of the union, the Plant Manager, or his designee, and Human Resources, to design such training and ensure that it meets the production needs of the plant and the goals of career development. The Committee shall meet at least four times a year to review the training program and make suggestions as to how to enhance it for the safe and efficient operation of the plant and achievement of profitability and customer satisfaction.

28

9)   **Voluntary Benefits:**

The parties agree that employees covered by the terms of this agreement may participate in voluntary benefit programs that may be available through the Fund Office. The Company agrees that, upon receipt of written authorization from any employee coved by the terms of this agreement, it will withhold the amounts authorized for purchase of voluntary benefits, and will remit such amounts to the providers of those benefits as designated in the authorization.

10)   **Unpaid Leave:**

Employees may take up to four weeks of unpaid leave in the following situations:

1.   One week increments
2.   No more than twice per year (i.e. up to 2 two week leaves)
3.   They must be doing "service" work for a charity or nonprofit, extending a vacation, recovering from a medical condition that was covered by our benefits or disability (and documented) or extending a bereavement leave.
4.   It must be scheduled at least two weeks in advance with your supervisor or manager *and* Human Resource VP, or Plant Manager.
5.   In an emergency such as a natural disaster, that timing may be waived by the plant manager and the HR VP.

11)   **Premium Pay for Voluntary Overtime:**

The company and the union may agree from time to time to offer premium pay for overtime shifts, including double time for Sundays if there are not sufficient volunteers to work on straight time or time and a half.

# EXTENSION AGREEMENT

## BETWEEN

## TEAMSTERS LOCAL 107

## &

## Aluminum Shapes, LLC

### January 1, 2020 to June 30, 2020

The above-mentioned Employer and Teamsters Local 107 hereby agree to extend all terms and conditions of their existing Collective Bargaining Agreement until June 30, 2020, with the following amendments:

**ARTICLE 8 – VACATION AND PERSONAL TIME**

**VACATION**

ADD:  After 5 years      120 vacation hours

**PERSONAL TIME**

Change (a) to read as follows:

All employees who have completed their probationary period shall receive five (5) paid personal days (paid at 8 hours per day) to use during the calendar year.

**JURY DUTY**

ADD:  Two (2) Days for Jury Duty pay. In the event any employee covered by this Agreement is required to serve jury duty. It is the employee's obligation to notify the Employer upon receipt of jury selection notification and to present such other evidence in order to be paid.

**ARTICLE 9 – HEALTH & WELFARE**

ADD:   Not withstanding the provisions of Article 9, the Union may suspend the operations of a delinquent employer three (3) working days after receipt of a verification by registered or certified mail, that such employer is delinquent.  Copies of the verification shall be sent by the administrator of the fund to the Employer and to the Local Union.

FOR THE COMPANY

FOR IBT, LOCAL 107

Mike Nugent, Recording Secretary/
Business Agent

1/16/2020

1-15-20

Date

Date

# EXTENSION AGREEMENT

## BETWEEN

## TEAMSTERS LOCAL 107

## &

## ALUMINUM SHAPES, LLC

## JULY 1, 2020 TO JUNE 30, 2021

**THE ABOVE-MENTIONED EMPLOYER AND TEAMSTERS LOCAL 107 HEREBY AGREE TO EXTEND ALL TERMS AND CONDITIONS OF THEIR EXISTING COLLECTIVE BARGAINING AGREEMENt UNTIL JUNE 30, 2021, WITH THE FOLLOWING AMENDMENTS:**

**TERM** – 1 Year, Expiration June 30, 2021

**HEALTH & WELFARE** – Maintain Current Rates until 12/31/20.  Beginning January 1, 2021, Maximum M.O.B. increase of 10%.

**WAGES -** Fifty Cents (.50¢) per hour increase.  Increase will be retroactive to July 1, 2020.  Retroactive will be paid as bonus.

**ARTICLE 10-b(V)** – Three (3) year call back rights.

**VACATION** – Maximum 40 hours rollover and maximum 40 hours cash out.

**VETERANS DAY** – Veterans Day will be a paid holiday for those that served in the Armed Forces.

**PROBATIONARY PERIOD** – Probationary period may be extended beyond 120 days, as long as it is mutually agreed upon by the Company and the probationary employee.

**ARTICLE IV** – Eliminate 12-hour shift language

**CROSS TRAINING/JOB CLASSIFICATION** – All employees will be cross trained to perform all production tasks, fork truck, crane etc.  Not to include specialty jobs such as maintenance, water treatment, etc.


**ANTI-DISCRIMINATION/HARRASSMENT POLICY** – Union employees will be subject to the Company Anti-Discrimination & Harassment Policy.


FOR THE COMPANY                    FOR IBT, LOCAL 107


*Doug Bathauer*                          *Mike Nugent*

                                       Mike Nugent, Recording Secretary
                                       Business Agent


 Doug Bathauer COO

Print Name


 08.28.2020                              8-27-20

Date                               Date



## Aluminum Shapes LLC

## Non-Discrimination and Anti-Harassment Policy and Complaint Procedure

**Objective**

Aluminum Shapes LLC is committed to providing a workplace that is free of any form of discrimination or harassment.

**Scope**

This policy applies to all employees, supervisors, managers, as well as applicants and third parties, including vendors.

**Discrimination**

As a part of our hiring or promotion process, it is a violation of the company's policy to reference a person's race, color, national origin, age, religion, disability status, gender, sexual orientation, gender identity, genetic information or marital status.

Discrimination is prohibited by a variety of federal, state and local laws, including Title VII of the Civil Rights Act 1964, the Age Discrimination Act of 1975 and the Americans with Disabilities Act of 1990.

**Harassment**

It is a violation of the company's policy to harass another employee. Harassment is any verbal or physical behavior that threatens, intimidates or coerces an employee or any person working for or on behalf of Aluminum Shapes LLC and may prevent them from performing their job.

According to our policy, the following behaviors and communications could be viewed as harassment or "bullying":

- Comments that are offensive or unwelcome regarding a person's nationality, origin, race, color, religion, gender, sexual orientation, age, body, disability or appearance, including epithets, slurs and negative stereotyping.
- Distribution, display or discussion of material that ridicules, denigrates, insults, belittles or shows hostility, aversion or disrespect toward an individual or group.

**Sexual Harassment**

Sexual harassment is a form of discrimination under Title VII of the Civil Rights Act of 1964. Under Title VII, there are two types of sexual harassment:

> 1) Quid pro quo which is a favor or advantage granted or expected in return for something.
>
> 2) Hostile work environment, one in which the employee is prevented from performing the duties of his/her job.

The following behaviors and communications are prohibited:

- Sexual bantering, "jokes" and "teasing"
- Off color language or jokes
- Sexual flirtations, advances or propositions
- Repeated requests for dates
- Requests or demands for sexual favors
- Verbal abuse of a sexual nature
- Verbal commentaries about an individual's body, sexuality, appearance or sexual orientation
- Sexually degrading words used to describe individuals
- Discussions of or questions about sexual desires, fantasies, experiences, frustrations
- Sexually explicit or sexually suggestive objects, cartoons, software, photos, pictures
- Unwelcome physical contact, such as patting, pinching or brushing against another person's body
- Sexually oriented or degrading gestures
- Other nonverbal communications, such as leers and gawks
- Any other behavior that violates this policy

**Consensual Romantic Relationship at Work**

While we discourage these relationships, they may develop. While you have the right to say "yes", you also have the right to say "no". If you feel pressure to become involved with someone with whom you do business, we urge you to use the complaint procedure below.

**Complaint Procedure**

If you feel you have been harassed or witness someone being harassed, first try to directly talk with the harasser. If this is not possible or doesn't result in a positive change, talk with human resources immediately. You will then be required to fill out a "Harassment Complaint Form". All investigations are treated confidentially and we will not tolerate any form of retaliation.

**Retaliation**

It is a violation of this policy to retaliate in response to a complaint of discrimination or harassment. Everyone should feel comfortable to speak his or her mind. Managers have a responsibility to create an open and supportive environment where employees feel comfortable to speak his or her mind. We will investigate all reported instances of concern. In every instance where improper behavior is found to have occurred, the company will take appropriate action. We will not tolerate retaliation against employees who raise genuine concerns in good faith. Retaliation will result in disciplinary action up to and possibly including termination.                    2.16.17 ds

EXHIBIT B

**TEAMSTERS LOCAL 837 BENEFITS FUNDS**
**POLICY FOR COLLECTING DELINQUENT CONTRIBUTIONS**

Adopted ___March 17___ , 2008

WHEREAS, the Teamsters Local 837 Pension Fund ("Pension Fund"), the Teamsters Local 837 Health and Welfare Fund ("Welfare Fund"), and the Teamsters Local 837 401(k) Fund ("401(k) Fund") (collectively referred to as "the Funds") are third party beneficiaries of numerous collective bargaining agreements, and other written agreements, between Teamsters Local 837 ("Local 837") and various employers (hereinafter referred to as "Signatory Employers"); and,

WHEREAS, in many circumstances, provisions of the aforementioned agreements require Signatory Employers to make contributions to the Funds on behalf of employees represented by Local 837 who are employed by said Signatory Employers; and,

WHEREAS, the aforementioned contributions are used by the Funds to provide benefits to participants and beneficiaries in the Funds' plans of benefits; and,

WHEREAS, the Boards of Trustees of the Funds desire to establish a policy and procedures for the uniform and orderly collection of the aforementioned contributions;

NOW, THEREFORE, the Boards of Trustees of the Funds adopt the following policy and procedures for the collection of delinquent contributions:

**A. Introductory Provisions**

1. The purpose of this Policy is to establish the procedure whereby contractually required contributions due to the Funds are collected. The procedures set forth in this Policy are uniform collection procedures that will allow for consistent enforcement of the

contribution obligations of Signatory Employers pursuant to their collective bargaining agreements with Local 837. The procedures and guidelines set forth herein are designed to encourage the timely payment of contributions by Signatory Employers. This Policy will provide the Funds and Signatory Employers with a definitive, understandable policy of how and when interest, liquidated damages, and other costs will accrue against a delinquent Signatory Employer, and the steps that will be taken by the Funds to collect any amounts due.

2. The Boards of Trustees of the Funds have each delegated the day-to-day authority to monitor contributions and enforce collection of such contributions to the co-chairs of said Boards. When the term "Trustees" is used in this document, it will refer to the individual Boards of Trustees, or the co-chairs of said Boards in the exercise of the authority granted to them by said Boards.

**B. General Provisions**

1. The Trustees are vested with the authority to implement and enforce the provisions of this Policy.

2. This Policy may be amended from time to time by a simple majority of the Boards of Trustees during their regularly scheduled meetings.

3. The co-chairs of the Boards of Trustees are authorized to establish any and all internal operating procedures necessary to implement the provisions set forth in this Policy, or to delegate the establishment of such procedures to the Fund Administrator. Such internal operating procedures should include, but need not be limited to, (1) timely posting and processing of reporting forms and contributions by the Fund Administrator, and prompt notification to the co-chairs and Fund Counsel of delinquent Signatory

Employers; and (2) a system of notification by the Fund Administrator to Signatory Employers if such Employers fail to promptly remit contributions due and owing, followed by a letter from Fund Counsel where appropriate. For purposes of this Policy, the term "Fund Administrator" shall mean any individual employed by the Funds to serve as the Fund Administrator, or any third-party entity engaged by the Funds to serve as Fund Administrator.

4. The Funds Office will maintain a file of currently effective collective bargaining agreements and other written agreements setting forth the detailed basis on which Signatory Employers are obligated to make contributions to the Funds.

**C. Timely Payment of Contributions**

1. The established due date for contributions from Signatory Employers shall be the due date set forth in the applicable agreement between said Signatory Employer and Local 837, or otherwise agreed upon by said Signatory Employer and Local 837. In the absence of such a specified due date, the established due date for contributions shall be the 15th day of the following month for each month where such contributions are due and owing.

2. When contributions are not received on the due date, the Fund Administrator shall, within thirty (30) days, notify the Signatory Employer that the contributions are delinquent. Similarly, the Fund Administrator will notify a Signatory Employer when and if it learns that the contributions submitted by it are not in the correct amount.

3. The Trustees shall ordinarily authorize Fund Counsel to send a letter to the delinquent Signatory Employer demanding immediate payment of all amounts due if the delinquency is in excess of sixty (60) days, and if the delinquency is greater than $1,500.

At their discretion and depending on the specific facts of the case, however, the Trustees may direct Fund Counsel to send such a letter without regard to these thresholds.

      4.  The Trustees shall ordinarily authorize Fund Counsel to initiate legal action against a delinquent Signatory Employer to collect all amounts due and owing when the Signatory Employer owes in excess of $4,000, is more than ninety (90) days delinquent, or is delinquent for three or more months of contributions.  At their discretion and depending on the specific facts of the case, however, the Trustees may direct Fund Counsel to initiate legal action without regard to these thresholds.

      5.  The Trustees may authorize any other action they see fit to collect delinquent contributions including, but not limited to, compelling an audit, directing Fund Counsel to file a bond claim, or pursuing payment from other third parties.

**D.  Interest for Delinquent Contributions**

      1.  No interest on a Signatory Employer's contributions will be collected if such contributions are received by the Funds within ten (10) days of the established due date, unless the Signatory Employer has earlier outstanding delinquencies or has been a chronic delinquent, in which case the Trustees may require interest to be paid regardless of the date on which the late payment is received.

      2.  In circumstances where a Signatory Employer offers an acceptable and timely explanation for its delinquency, the Trustees shall be vested with the authority to waive interest on that Signatory Employer's contributions if such contributions are received at any time between the eleventh (11th) day and the thirtieth (30th) day following the due date.

3. All interest for contributions received after the thirtieth (30th) day following the date the contributions are due will not be waived unless the Signatory Employer, in the sole discretion of the Trustees, provides a timely, valid, and verifiable showing of extenuating circumstances.

4. To resolve a dispute over the payment of interest, the Trustees may agree to a partial or full waiver of interest if, in their judgment, such partial or full waiver is in the best interest of the Funds in light of the Signatory Employer's ability to pay, the cost of litigation, and the likelihood of success of any litigation brought to collect delinquent contributions.

5. Interest assessed shall be at a rate of 12% per annum.

**E. Liquidated Damages**

1. Liquidated damages will not be collected if contributions are received within ten (10) days from the established due date unless the Signatory Employer has earlier outstanding delinquencies or has been a chronic delinquent, in which case the Trustees may require liquidated damages to be paid regardless of the date on which the late payment is received.

2. When the Signatory Employer makes contributions payments within sixty (60) days of the established due date, liquidated damages will be waived at the Signatory Employer's request in circumstances where the Signatory Employer provides a reasonable explanation for its delinquency. The Trustees, in their discretion, shall determine the reasonableness of any such request and explanation.

3. Liquidated damages for contributions received beyond sixty (60) days after the established due date will not be waived unless the Signatory Employer, in the sole

discretion of the Trustees, provides a timely, valid, and verifiable showing of extenuating circumstances.

    4. Liquidated damages will ordinarily not be waived in circumstances where a Signatory Employer is:  (a) more than ninety (90) days late with its contribution payment; (b) delinquent with three or more payments at any one time; (c) chronically making late payments; or (d) sued by the Funds in an action for the collection of delinquent contributions.

    5. To resolve a dispute over the payment of liquidated damages, the Trustees may agree to a partial or full waiver of liquidated damages if, in their judgment, such partial or full waiver is in the best interest of the Funds in light of the Signatory Employer's ability to pay, the cost of litigation, and the likelihood of success in any litigation brought to collect delinquent contributions.

    6. Liquidated damages assessed shall be in the amount of ten percent (10%) of the contributions due and owing.

## F. Miscellaneous Provisions

    1. In circumstances where legal action is brought by the Funds to collect delinquent contributions, the Signatory Employer that is the subject of said legal action shall be required to pay the Funds' reasonable attorneys' fees and costs incurred in such action.

    2. The Funds shall have the right to audit the books and records of any Signatory Employer upon request, including but not limited to circumstances where the Funds have reason to believe the Signatory Employer's reporting has not been accurate.

6

2.  The Signatory Employer shall be required to pay the Funds' audit fees in circumstances where: (a) the Funds conduct an audit of the Signatory Employer because the Signatory Employer has failed to submit required reports to the Funds, or submits reports that are determined by the Funds to be inaccurate; and (b) the Signatory Employer refuses to submit to an audit of its books and records by the Funds, and an audit is subsequently conducted as the result of the initiation of legal action.

3.  Notwithstanding any provision of this Policy, in circumstances where the Funds have initiated legal action against a Signatory Employer to recover delinquent contributions, the Funds shall be entitled to any and all remedies available to them in such action under law and equity, including but not limited to injunctive relief.

WHEREFORE, the Boards of Trustees of the Funds adopt this Policy on the date first indicated above, as evidenced by their signatures below.

UNION TRUSTEES:                                    MANAGEMENT TRUSTEES:

_____                            _____

_____                            _____

_____                            _____

7